## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
METAL PARTNERS REBAR, LLC        :
                                 : CIVIL ACTION
          Plaintiff              :
                                 :
          vs.                    :
                                 : NO. 13-CV-3318
CARSON CONCRETE CORPORATION      :
and ANTHONY J. SAMANGO, JR.      :
                                 :
          Defendants             :
```

### DECISION

**JOYNER, J.**                                **May 6th, 2015**

This civil action was tried non-jury before the undersigned on January 26, 2015.  The parties have since submitted their proposed factual findings and legal conclusions and the matter is now ripe for adjudication.  To that end, we now make the following:

### Findings of Fact

1.  Plaintiff is Metal Partners Rebar, LLC, an Illinois limited liability company with its principal place of business at 55 S. Main Street, Suite 394, Naperville, Illinois.

2.  Defendant is Carson Concrete Corporation, a Pennsylvania corporation with its principal place of business at 5 Creek Parkway, Boothwyn, Pennsylvania.

3.  Anthony J. Samango, Jr. is an individual, a citizen of Pennsylvania and the sole owner and President of Carson Concrete.

4.    Anthony J. Samango, III, is the Vice President of Carson Concrete.

5.    Carson Concrete is a construction company specializing in large-scale concrete construction.  In the course of that business, it purchases, *inter alia*, concrete and steel products, including steel rebar.

6.    Metal Partners is a steel rebar distributor and fabricator and a re-seller of various types of concrete-related products.  Although it sells its products all over the country, Metal Partners has just three fabrication shops – one each in Bakersfield, California, Chicago, Illinois and Bala Cynwyd, Pennsylvania.

7.    Metal Partners was formed in January, 2008 and has two partners - Frank Bergren and Doug Anderson.  Frank Bergren is the managing partner who oversees the overall operation of the business including anything relating to accounts receivable, accounts payable, operation of the fabrication shops and the some 52 company employees.  Mr. Bergren also has some sales responsibilities.  Doug Anderson is primarily an investment partner.

8.   Metal Partners has several sales representatives, one of whom is Michael Actman, who has worked as a 1099 employee for Metal Partners for the past 3 ½ years.  Mr. Actman's primary

2

duties as a sales representative are to find customers who will buy fabricated and/or stock steel rebar and pay their bills in a timely manner.

9.   Mr. Actman has 30-plus years of experience in the steel industry and prior to his employment with Metal Partners, was a partner/principal in several other steel and steel fabrication businesses.  He had become acquainted with Anthony Samango, Jr. when one of his prior businesses, Brussels Pipe, rented space in a building owned by Mr. Samango in Conshohocken, Pennsylvania. In 2003, while a principal in another company, Steel Services, Mr. Actman had sold steel to Carson Concrete thereby enabling Carson to complete a job that it was then doing in Philadelphia.

10.   In large part because of their prior relationship, on or about November 14, 2011, Anthony Samango, III (hereafter "Samango III") contacted Mr. Actman about purchasing rebar for Carson Concrete.  At Metal Partners' request, Anthony Samango, Jr., (hereafter "Samango Jr.") on behalf of Carson Concrete, signed an Application for an Open Line of Credit (the "Credit Agreement"), denoting on the line next to his signature that his title was "President."

11.   The Credit Agreement states, in relevant part that:

I(we) hereby apply for business credit with Metal Partners Company, Inc. and agree to payment within established credit terms (Net 30 Days).  In consideration of extending credit to the applicant, I(we) agree to be personally, jointly and severally responsible for the payment of all sums due and owing and do unconditionally and irrevocably guarantee the

applicant's payments.  I(we) understand that all past due amounts are subject to an administrative collection fee of $50.00.  I(we) also agree to pay all court costs and reasonable attorneys fees if litigation is necessary to collect past sums. ...

12.  Mr. Samango Jr. was presented with the credit agreement by Carson's controller, who told him that they were about to do business with a new vendor who wanted a credit application.  He did not read the credit agreement before he signed it.  Because the word "President" was on the line next to his signature, it was Mr. Samango Jr.'s understanding that he was signing the application for and/or on behalf of Carson Concrete.

13.  Following the execution of the credit application, the parties would separately negotiate the price terms for the steel-related products and the orders for shipment for a particular project or job for which Carson Concrete was involved.  These negotiations were confirmed in a series of emails between Michael Actman and Mr. Semango, III.  Although Mr. Semango specified due dates for preparation of shop drawings and Metal Partners agreed to guarantee Vector Shades' representation that it could have the elevator pit, foundation mat and dowels detailed by November 15, 2012 for the 1910 Spring Garden Street job and by November 21, 2012 for the 3737 Market Street job, no other mention of delivery or other due dates appears in the parties' emails.

14.  Between November, 2011 and April, 2013, Metal Partners sold and delivered steel-related products and services (primarily

4

rebar and detailing/fabrication services) to Carson Concrete and invoiced Carson Concrete for the same. Metal Partners' invoices to Carson included a description of the goods ordered, the quantity of the goods, the negotiated and agreed-upon unit price for the goods and the amount owed on each to arrive at a sum total. Each invoice also stated at the bottom that the terms for payment were "Net 30," and gave a Payment Due Date.

15. Similar to the invoices, each corresponding Shipping Statement issued by Metal Partners to Carson Concrete also indicated at the bottom that the terms were "Net 30."

16. Despite the language of the invoices and shipping statements, over the course of time that Metal Partners provided steel products and related services to Carson Concrete, on average it took Carson seventy-one (71) days from the date of invoice to pay. Metal Partners never objected to Carson's payment practices before April 19, 2013.

17. The steel products and services which Metal Partners delivered to Carson Concrete between November, 2011 and April, 2013 were for four construction projects, the first of which was in Bucks County (the Bucks County Justice Center), while the other three were in Center City Philadelphia (at 3737 Market Street, 30th and Chestnut Streets and 1910 Spring Garden Street).

18. The agreed prices and quantities for the steel and steel-related products for the Market Street and Spring Garden

Street projects were negotiated by the parties on or about November 7, 2012.  For the Spring Garden Street project, the negotiated price was $.43 per lb or $860 per ton.  For the Market Street project, the agreed-upon price was initially $.44 per pound or $880 per ton but this was later reduced to $.43 per pound or $860 per ton.  The agreed price for the steel-related products for the Chestnut Street project was $.4395 per pound or $879 per ton.

19.  Metal Partners was also to provide detailing services to Carson Concrete on the Market Street, Chestnut Street and Spring Garden Street projects and it hired Vector Shades of McLean, Virginia to do the detailing for all three jobs.

20.  Generally speaking, detailing is the first step in fabricating steel rebar.  In this case, Vector Shades would generate shop drawings, which are in essence a map for where the fabricated rebar is to go.  Shop drawings also specify size, shapes, bar marks and lengths and are done for each specific portion of a project designating what rebar is to be installed in that specific section.

21.  Fabricated rebar is cut, bent and machined from stock lengths according to plans.  Usual stock lengths are 20, 30, 40 and 60 feet.  Rebar is graded according to its tensile yield, which is the amount of load it will bear before breaking.

22.  At various times throughout the parties' business

6

relationship and as early as March, 2012 while the Bucks County
Justice Center project was underway, Carson had complaints with
respect to the quality and accuracy of the rebar shop drawings,
fabrication of the rebar and the timeliness of the deliveries by
Metal Partners.  Beginning in February, 2013 and continuing
through April, 2013, Metal Partners had numerous problems getting
correctly fabricated rebar delivered on time to Carson at the
3737 Market and Chestnut Street projects.

23.  At one point in April, 2013, Carson Concrete was
delayed from working on the Market Street job for a period of 11
days because it didn't receive the correctly fabricated rebar
which it had ordered from Metal Partners.

24.  Although Carson repeatedly informed Metal Partners that
it was on a very tight schedule, that Metal Partners' delays and
errors were costing Carson money, and it did return several
portions of the shipments to Metal Partners to be re-fabricated
correctly, at no time did it cancel any of its orders with Metal
Partners.

25.  As a consequence of the delays caused by Metal
Partners' incorrect fabrication and untimely deliveries of rebar
to the various job sites, Carson Concrete was forced to incur
higher labor costs, crane, scaffolding, forms and other equipment
rental expenses, and general contractor backcharges than it would
have otherwise.

7

26.  On April 16, 2013, Mr. Samango, III sent an email to Michael Actman reciting the recent problems that Carson had been having getting correctly fabricated rebar from Metal Partners in a timely fashion and informing him that "this is unacceptable and is going to result in deducts from MOP invoices."  Mr. Samango went on to tell Mr. Actman that he "would like to speak to the owner tomorrow as this issue is serious."  This was not the first time that Mr. Samango III had asked to speak with Mr. Bergren.

27.  Mr. Bergren finally called Mr. Samango, III on April 19, 2013, in response to the several requests that he do so from Mr. Actman.  This was the first time that Mr. Bergren became personally involved in the Carson Concrete account.  While Mr. Bergren did not know a lot about or fully understand the problems that Carson was experiencing, he did say that he would look into it and would get back to Mr. Samango.

28.  In that same conversation, Mr. Bergren then told Mr. Samango that they needed to discuss the matter of unpaid invoices that were past 60 days, and that he wouldn't be able to ship more steel unless he received payment from Carson.  In response, Mr. Samango told Mr. Bergren that he wouldn't get his money until Mr. Samango got his steel.  Mr. Bergren responded that didn't work for him and the conversation ended.

29.  Carson Concrete did issue a check to Metal Partners on April 19, 2013 in the amount of $31,033.66 in payment of the

8

Metal Partners invoices from February 4 - February 28, 2013. This was in keeping with Carson's regular business practice of taking an entire month's worth of invoices at the end of each month, submitting them for approval and then processing them for payment.  It is not uncommon for Carson's approval and payment process to take up to thirty or so days to complete, with the result that its payments are rarely, if ever, effectuated within thirty days from the date of invoice.

30.  The April 19, 2013 telephone discussion between Mr. Bergren and Mr. Samango, III was the first time that Metal Partners raised an objection to Carson's late payment of its invoices.

31.  Immediately after his phone conversation with Mr. Samango, III terminated, Mr. Bergren telephoned Mr. Actman and informed him that, with the exception of the work in progress, Metal Partners would no longer ship steel rebar to Carson Concrete.  The next business day, a Monday, Mr. Actman telephoned Mr. Samango, III and told him that Metal Partners would no longer be selling him rebar with the exception of the work in progress.

32.  Carson Concrete subsequently issued a stop-payment order on its check No. 410, which had been issued on April 19, 2013 in the amount of $31,033.66.

33.  Metal Partners last shipped rebar to Carson Concrete on April 30, 2013.

9

34.   At present, there remains a total of $246,998.38 in unpaid invoices on Carson Concrete's account with Metal Partners for rebar shipments from February 4 through April 30, 2013.

35.   As a result of Metal Partners' termination of their business relationship in April, 2013, Carson Concrete was forced to find another supplier of steel rebar and detailing services to complete the work on the Bucks County, 3737 Market Street, 30th and Chestnut Street and 1910 Spring Garden Street projects. Carson was thereafter supplied its steel requirements by Men of Steel at the rate of $910 and $955 per ton and by Barker Steel at the rate of $880 per ton.

### Discussion

This case presents a somewhat unusual scenario in that both Plaintiff and Defendants are seeking to recover damages from one another for breach of what they seem to believe are different contracts covering the same series of transactions.  They each make their supporting arguments under different theories - Plaintiff under Illinois common law, and Defendants under the Uniform Commercial Code.  Specifically, Plaintiff in reliance only upon the credit application, contends that by failing to pay in full the amounts due on its outstanding invoices between February and April 2013, Carson Concrete and/or Anthony Samango,

10

Jr. were in breach of contract.[1]  For their part, Defendants rely upon the series of emails between Michael Actman and Anthony Samango, III to justify their counterclaim that Plaintiff was in breach for failure to deliver goods.  Defendants are seeking to recover their "cover" and other incidental damages[2] sustained as a

---

[1]   In the alternative, Plaintiff contends that it is entitled to recover the amount of its unpaid invoices under the theory of unjust enrichment.

[2]  Pursuant to UCC §2-711, 810 ILCS 5/2-711:

(1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2-612 [810 ILCS 5/2-612]), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid

　　　(a) "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or

　　　(b) recover damages for non-delivery as provided in this Article (Section 2-713 [810 ILCS 5/2-713]).

(2) Where the seller fails to deliver or repudiates the buyer may also

　　　(a) if the goods have been identified recover them as provided in this Article (Section 2-502 [810 ILCS 5/2-502]); or

　　　(b) in a proper case obtain specific performance or replevy the goods as provided in this Article (Section 2-716 [810 ILCS 5/2-716]).

　　　...

"Cover" is defined in §2-712 as buyer's procurement of substitute goods:

(1) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2-715 [810 ILCS 5/2-715]), but less expenses saved in consequence of the seller's breach.

(3) Failure of the buyer to effect cover within this Section does not

11

result of Plaintiff's decision to cease delivering steel.

Because the Credit Application provided that any disputes between

the parties would be governed by Illinois law,[3] we apply the law

of Illinois to resolve the issues presented here.

    *1. Breach of Contract - Illinois Common Law*

    In order to prevail on a cause of action for breach of

contract under Illinois law, a plaintiff must show: (1) the

existence of a valid and enforceable contract; (2) plaintiff's

performance of all required contractual conditions; (3)

---

    bar him from any other remedy.

810 ILCS 5/2-712.

    [3] In this regard, the Credit Application specifically states the
following in relevant part:

> ... I (we) agree that any and all disputes between the parties shall be
> governed by the laws of the state of Illinois.  I (we) further agree
> that the courts of the state of Illinois shall have exclusive
> jurisdiction in any litigation between the parties arising out of this
> credit application and agreement and/or the sale by Metal Partners, Inc.
> of any goods or services to the applicant(s).  I(we) agree to submit to
> the jurisdiction of such courts and that such courts constitute a
> convenient forum and that process may be served by certified mail return
> receipt request at the applicant's above address.  ...

Although Plaintiff has obviously chosen to disregard the forum selection
language in its credit application, it hereby seeks to enforce its choice of
law provision.  Inasmuch as Defendant has not objected to these elections and
is in agreement that Illinois law should be applied in this case, we shall
apply the law of Illinois.  In so doing, we note that there is little, if any
difference between Pennsylvania and Illinois law with respect to the legal
theories advanced in this action. See, e.g., Joyce v. Erie Insurance
Exchange/Erie Insurance Co., 74 A.3d 157, 169 (Pa. Super. 2013)("to adequately
plead breach of contract, a complaint must allege the existence of the
contract, a breach of a duty imposed by the contract, and damages that result
from that breach"; "the elements of unjust enrichment are benefits conferred
on defendant by plaintiff, appreciation of such benefits by defendant, and
acceptance and retention of such benefits under such circumstances that it
would be inequitable for defendant to retain the benefit without payment of
value."); John J. Dougherty & Sons v. McKenna American, LLC, No. 2481 EDA
2012, 2013 Pa. Super. Unpub. LEXIS 3032 at *8 (Pa. Super. July 29, 2013);
Merrill Iron & Steel, Inc. v. Blaine Construction Corp., Civ. A. No. 14-221,
2014 U.S. Dist. LEXIS 89932 (W.D. Pa. July 2, 2014).

defendant's breach of the terms of the contract; and (4) damages resulting from the breach.  Spitz v. Proven Winners North America, LLC, 759 F. 3d 724, 730 (7th Cir. 2014); RTP, LLC v. Orix Real Estate Capital, Inc., 2014 U.S. Dist. LEXIS 124654 at *15 (N.D. Ill. Sept. 8, 2014); Burkross v. Thompson, 408 Ill. App. 3d 1122, 1 N.E.3d 663, 376 Ill. Dec. 951 (2011).  In order to form a valid contract, there must be an offer and acceptance, consideration, and definite and certain contractual terms.  Lindy Lu LLC v. Illinois Central Railroad Company, 984 N.E. 2d 1171, 1176, 368 Ill. Dec. 701 (Ill. App. 2013)(citing Van Der Molen v. Washington Mutual Finance, Inc., 359 Ill. App. 3d 813, 823, 835 N.E. 2d 61, 296 Ill. Dec. 206 (2005)); Fife v. mPhase Technologies, Inc., 2014 U.S. Dist. LEXIS 172536 at *24 (N.D. Ill. Dec. 15, 2014).

Consideration is defined as a bargained-for exchange of promises or performance between the parties.  Burkross, supra,(citing Zirp-Burnham, LLC v. E. Terrell Associates, Inc., 356 Ill. App. 3d 590, 600, 826 N.E. 2d 430, 292 Ill. Dec. 289 (2005)).  And "[i]n Illinois, a contract is deemed sufficiently definite 'if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do.'" Miniat v. Ed Miniat, 315 F.3d 712, 716 (7th Cir. (quoting Midland Hotel Corp. V. Reuben H. Donnelly Corp., 118 Ill. 2d 306,

515 N.E. 2d 61, 65, 113 Ill. Dec. 252 (Ill. 1987)).

When reviewing a contract, a court must consider the contract as a whole and must determine the intent of the parties. Finch v. Illinois Community College Board, 315 Ill. App. 3d 831, 836, 734 N. E. 2d 106, 248 Ill. Dec. 398 (2000).  A court will not imply factual conditions that are not expressed in a contract, but a court cannot construe a contract outside the legal conditions underlying a transaction, and existing laws and statutes become implied terms of a contract as a matter of law. Fox v. Heimann, 375 Ill. App. 3d 35, 44 872 N.E. 2d 126, 136, 313 Ill. Dec. 366 (2007).  In addition, "[p]arties to a contract may make 'time is of the essence' a provision of the contract, meaning that performance by one party at the time or within the time frame specified in the contract is essential to enable him to require counter-performance by the other party."  Arnhold v. Ocean Atlantic Woodland Corp., 284 F.3d 693, 699 (7th Cir. 2002)(quoting Maywood Proviso St. Bank v. York St. Bank & Trust Co. 252 Ill. App. 3d 164, 169, 192 Ill. Dec. 123, 625 N.E. 2d 83 (1st. Dist. 1993)).

"If a party fails to perform his duties under a contract without a valid excuse, he is liable for a breach of contract, and the remedies for the breach would depend on whether the breach was material or minor."  Finch, supra, 734 N.E. 2d at 110. "It is black letter law in Illinois that only a 'material' breach

14

of a contract provision by one party will justify non-performance by the other party." Sahadi v. Continental Illinois National Bank and Trust Co. Of Chicago, 706 F.2d 193, 196 (7th Cir. 1983). "To determine whether a breach is material, a court applying Illinois law must ask 'whether the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it'" or, in other words, "whether the performance of that provision 'was a *sine qua non* of the contract's fulfillment.'" Levin v. Grecian, 974 F. Supp. 2d 1114, 1122-1123 (N.D. Ill. 2013)(quoting Arrow Master, Inc. v. Unique Forming Ltd., 12 F.3d 709. 715 (7th Cir. 1993)and Haisma v. Edgar, 218 Ill. App. 3d 78, 578 N.E. 2d 163, 168, 161 Ill. Dec. 36 (Ill. App. 1991)).  At times, "the determination of materiality is a complicated question of fact, involving an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the nonbreaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage." Sahadi, supra.

     Finally, a party cannot sue for breach of contract without alleging and proving that he has himself substantially complied with all the material terms of the agreement. Costello v.

Grundon, 651 F.3d 614, 640 (7th Cir. 2011)(citing George F.
Mueller & Sons, Inc. V. N. Ill. Gas Co., 32 Ill. App. 3d 249, 336
N.E.2d 185, 189 (Ill. App. Ct. 1975)).  Damages for breach of
contract are intended to give the plaintiff the difference
between where he would have been financially had the contract not
been broken, and where he is in fact.  Emerald Investments
Limited Partnership v. Allmerica Financial Life Insurance and
Annuity Co., 516 F.3d 612, 619 (7th Cir. 2008).  Generally
speaking, if a party to a contract breaks it, the other party can
abandon the contract and sue for damages, or it can continue with
the contract and sue for damages.  Id, at 618 (citing, *inter
alia*, Sahadi, 706 F.2d at 196-197 and South Beloit Electric Co.
V. Lar Gar Enterprises, Inc., 80 Ill. App. 2d 367, 224 N.E. 2d
306, 310-11 (Ill. App. 1967)).  However, if it makes the latter
election, it is bound to the obligations that the contract
imposes on it.  Id.(citing, *inter alia*, Wollenberger v. Hoover,
346 Ill. 511, 179 N.E. 42, 57 (Ill. 1931) and Continental Sand &
Gravel, Inc. v. K & K Sand & Gravel, Inc., 755 F.2d 87, 93 (7th
Cir. 1985)).

Breach may also be excused or waived: "[w]aiver is defined
as the intentional relinquishment of a known right.  Levin,
supra, 974 F. Supp. 2d at 1124(quoting Ryder v. Bank of Hickory
Hills, 146 Ill. 2d 98, 585 N.E.2d 46, 49, 165 Ill. Dec. 650
(Ill. 1991)).  "Under Illinois law, ... a contracting party may

16

waive provisions beneficial to it or waive strict compliance by
conduct or actions 'indicating that strict compliance with a
particular provision will not be required.'" <u>In re Krueger</u>, 192
F.3d 733, 739 (7th Cir. 1999)(quoting <u>Barker v. Leonard</u>, 263 Ill.
App. 3d 661, 200 Ill. Dec. 507, 635 N.E.2d 846, 848 (1994) and
<u>City of Chicago v. Chicago Title & Trust Co.</u>, 205 Ill. App. 3d
728, 150 Ill. Dec. 478, 563 N.E. 2d 65, 70 (1990)[noting that a
party accepting late payments may waive its right to timely
payments unless it gives a definite and written notice of the
intention to require strict compliance]).  The party claiming a
waiver of a breach of contract must prove that the non-breaching
party (1) knew of its right to assert the breaches, and (2)
intended to waive the alleged breaches.  <u>Levin</u>, at 1125.

    *2.  Breach of Contract - Uniform Commercial Code*

    As noted, Defendants here also invoke Article 2 of the
Uniform Commercial Code ("UCC"), which has been codified in
Illinois at 810 ILCS 5/2-101, *et. seq.*  Inasmuch as the UCC
applies to transactions for the sale of goods[4], we would agree
that the UCC likewise has application here.  Indeed, under the
UCC, an enforceable contract for the sale of goods "may be made

---

    [4]  "Goods" of course, "means all things, including specially
manufactured goods, which are movable at the time of identification to the
contract for sale other than the money in which the price is to be paid,
investment securities, ... and things in action.  'Goods' also includes the
unborn young of animals and growing crops and other identified things attached
to realty as described in the section on goods to be severed from realty. ..."
810 ILCS 5/2-105(1).

in any manner sufficient to show agreement including conduct by
both parties which recognizes the existence of such a contract."
Dean Foods Co. v. Brancel, 187 F.3d 609, 617 (quoting U.C.C. §2-
204(1)).  And, "[u]nless otherwise unambiguously indicated by the
language or circumstances ..., an order or other offer to buy
goods for prompt or current shipment shall be construed as
inviting acceptance either by a prompt promise to ship or by the
prompt or current shipment of conforming or non-conforming goods,
but such a shipment of non-conforming goods does not constitute
an acceptance if the seller seasonably notifies the buyer that
the shipment is offered only as an accommodation to the buyer."
810 ILCS 5/2-206(1)(b).

Here, Defendants assert that Plaintiff is in breach of four
installment contracts[5] which arose out of a series of telephone
communications between Michael Actman and Anthony Samango, III in
November, 2011 and November, 2012 pursuant to which Metal
Partners would supply Carson with all of the rebar needed for the
four construction projects at issue.  The terms of these
contracts[6], according to Defendants, were memorialized in several

---

[5] An "installment contract" is one which requires or authorizes the
delivery of goods in separate lots to be separately accepted, even though the
contract contains a clause "each delivery is a separate contract" or its
equivalent.  810 ILCS 5/2-612(1).

[6]  It is interesting that the UCC recognizes a distinction between an
"agreement" and a "contract."  Under UCC §1-201(b)(3), "'agreement', as
distinguished from 'contract', means the bargain of the parties in fact, as
found in their language or inferred from other circumstances, including course
of performance, course of dealing, or usage of trade as provided in Section 1-
303." §1-201(b)(12), in turn, provides that a "'contract', as distinguished

18

emails between Mr. Actman and Mr. Samango, III in October and November, 2011, on or about November 7 and 8, 2012 and February 16 and 19, 2013.  In this regard, UCC §2-207(3) provides: "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract.  In such case, the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act."  810 ILCS 5/2-207(3).  What's more, "[a] practice, under the rubric of 'course of dealing,' can be evidence of what a contract requires."  Cloud Corp. v. Hasbro, Inc., 314 F.3d 289, 298 (7th Cir. 2002)(citing, *inter alia*, UCC §1-205 and *Restatement (Second) of Contracts* §223 (1981)).[7]

---

from 'agreement', means the total legal obligation that results from the parties' agreement as determined by the Uniform Commercial Code as supplemented by any other applicable laws."  810 ILCS 5/1-201(b)(3), (12).

[7] UCC §1-3-3 defines course of performance, course of dealing and usage of trade.  That section provides as follows in relevant part:

(a) A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if:

(1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and

(2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

(b) A "course of dealing" is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

© A "usage of trade" is any practice or method of dealing having such

19

In reviewing the emails attached to the Defendants'
counterclaim, it appears that in November, 2012, Mr. Samango, III
and Mr. Actman were negotiating an agreement for purchase of
rebar by Carson from MPR for several construction projects.
Apparently Mr. Samango had complained to Mr. Actman about the
detailing on a previous job (which we shall assume was the Bucks
County Justice Center since there is no evidence of prior
dealings between MPR and Carson) and that he was seeking
assurances that the problems would not happen again.  Mr. Actman
forwarded Mr. Samango's email to Seth Gatchell, the Rebar
Detailing Manager at Vector Shades who responded via email back
to Mr. Actman on November 7, 2012 as follows:

> "For 3737 Science Center we can have the elevator pit,
> foundation mat and dowels detailed by 11/21/12.  I will need
> CAD drawings for the job by 11/09/12 to deliver these on
> time.
>
> For 19th & Chestnut (1910 Spring Garden St.) We can have the
> pits, foundation mat and dowels by 11/15/12.  We will need
> CAD drawings for this job also by 11/09/12.
>
> Also please confirm that we have the latest set of drawings
> for each job.  I would like to get the latest set of

---

regularity of observance in a place, vocation, or trade as to justify an
expectation that it will be observed with respect to the transaction in
question. ...

(d) A course of performance or course of dealing between the parties or
usage of trade in the vocation or trade in which they are engaged or of
which they are or should be aware is relevant in ascertaining the
meaning of the parties' agreement, may give particular meaning to
specific terms of the agreement, and may supplement or qualify the terms
of the agreement. ...

  ...

810 ILCS 5/1-303 (a) - (d).

architectural and structural drawings in PDF format for both jobs."

A short time later, Mr. Actman on behalf of Plaintiff, forwarded Mr. Gatchell's email to Mr. Samango, III and added:

"Anthony,

We will guarantee what Seth has said below.  If Seth is not able to fulfill the initial drawing dates due to circumstances within his control, we will credit Carson Concrete $20/ton for the rebar on the drawings mentioned below.  If the circumstances are due to Carson, project engineer, etc, there will be no credits issued.

We will do both jobs at .42/lb or $860/ton.

We will need purchase orders and responses to Seth's requests by 11/9/12 in order to maintain the time frames required."

Half an hour later, Mr. Samango, III responded:

"Mike,
Please start with the shop drawings now.

PO#3604   1910 Spring Garden
Shops 11/15 - 12/24/12 We will send Auto Cad/PDF Files now. There may be a minor change to the mat fdn due to a building next door, info to follow.

PO#3605    3737 Market St.
Shops 11/21 - 12/21/12 Auto Cad files are not available, we will send current drawings.  There will be some revisions in the next few weeks which will need to be incorporated and cannot slow the first drawing submittal.

We will deduct $20 / ton if the first shops on either project are late, we are giving Seth a few day head start from his 11/9 date so that will make up for the few notes above.

$860/ ton total.

Please make sure the detail - shipping is smooth."

A few minutes later, Mr. Samango added one final detail:

"Please include one dropped trailer for each project."

The following day, November 8, 2012, Mr. Actman wrote:

"Anthony
Agreed.  However, one trailer must be unloaded prior to
sending next trailer.  Only one dropped trailer on site at
any time Mike"

Shortly thereafter, Mr. Samango responded: "Ok."

Then, via email dated February 16, 2013, Mr. Actman again

wrote to Mr. Samango:

"Anthony
Thank you for order # 3701 for the foundation at 30th &
Chestnut sts. in Phila, Pa.
The following have been discussed and agreed to by you and
I.
1. Price-43.95 for approx 200-250 tons for the foundation.
If you decide to release additional tons to MPR and we reach
a minimum total of 500 tons, the price will be retroactive
to 42.95 for all tons purchased from MPR for this project.
This is a unit price job.
2.  Detailing-Detailing will be done by Vector Shades.  They
will detail the entire job.  MPR will pay and be responsible
for detailing of portions of the project where MPR supplies
the rebar.  Carson Concrete will be pay Vectorshades and be
responsible for any portions of the detailing where tons are
not supplied by MPR.  The rate of detailing per ton is
$17.00.
3. MPR will drop two loaded trailers at site and will expect
a reasonable turnaround on the unloading of said trailers.
Thank you.
Michael Actman
MPR"

Mr. Samango confirmed these terms on February 19, 2013 in an

email which reads:

"Mike,

We have an agreement on the Chestnut Street project please
see below.

1st set of rebar shop drawings are due this Friday 2/22/13.

22

Continue to provide shop drawings per an agreed upon
schedule so that the project rebar shop drawings are 100%
complete before 5/31/13.

Thank you.

Anthony"

It thus appears that while the parties did indeed reach an
agreement that MPR would supply fabricated rebar to Carson
Concrete for projects at 3737 Market Street, 1910 Spring Garden
Street and 30th and Chestnut Streets in Philadelphia at the prices
noted, that detailing services would be provided by Vector
Shades, and that payment for the rebar shipped would be made
"within accepted credit terms (Net 30 days)," no mention is made
in the emails memorializing the agreement that "time is of the
essence" or of any deadlines for completion or delivery of
anything other than shop drawings.  It also appears from the
references in the February 2013 emails to the price differentials
in the detailing that MPR may not have been Carson's only rebar
supplier for these jobs.  In the "absence of specific time
provisions", "the time for shipment or delivery or any other
action under a contract if not provided [under UCC Article 2] or
agreed upon, shall be a reasonable time."  810 ILCS 5/2-309(1).[8]

---

[8] Indeed, UCC, §2-309 specifically applies to the "absence of specific
time provisions" and "notice of termination" and provides as follows:

(1) The time for shipment or delivery or any other action under a
contract if not provided in this Article or agreed upon shall be a
reasonable time.

(2) Where the contract provides for successive performances but is
indefinite in duration it is valid for a reasonable time but unless

Consequently, in examining the evidence produced at trial in light of the preceding authorities and as suggested in our Findings of Fact, we now conclude that the parties clearly entered into contracts for the sale on credit of fabricated rebar by Plaintiff to Defendants for Defendants' jobs at 3737 Market Street, 1910 Spring Garden Street and 30th and Chestnut Streets in Philadelphia under both Illinois common law and Article 2 of the Uniform Commercial Code.  Under the written terms of those agreements, Plaintiff was to deliver correctly fabricated rebar as per the purchase orders within a reasonable time and Defendant was to pay Plaintiff's invoices for same within thirty (30) days after they were issued.

These terms notwithstanding, the record further evinces that it was apparently the normal course for Defendant to provide Plaintiff with a date for delivery several days prior and for Plaintiff to then deliver the product on or about the date specified.  Although there were several instances when the rebar which Plaintiff delivered was not fabricated correctly and/or there were pieces missing, on those occasions Plaintiff took it

---

otherwise agreed may be terminated at any time by either party.

(3) Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable.

810 ILCS 5/2-309.

back and later delivered the correct product, which Defendant accepted.  It was Defendant's practice to gather all of a given month's invoices at the end of that month and then process them for payment.  This payment processing typically took another several weeks with the result that an invoice that was issued at the beginning of a month might not be paid for sixty days or more.  Indeed, the parties have stipulated that it took Carson an average of 71 days to pay Plaintiff's invoices.  Plaintiff accepted these late payments without complaint.

This arrangement seems to have worked fairly well until mid-April, 2013 when the fabrication and delivery problems and Mr. Samango III's corresponding complaints became much more frequent. MPR delivered rebar on at least one occasion several hours later than Carson had apparently verbally demanded and on several occasions, days later than Carson had instructed.  The late deliveries were occasioned at least once when Plaintiff's crane broke down and once when Plaintiff's employees for some unknown reason could not work over a weekend.  (See, e.g., Defendant's Exhibit "L").  Because of this series of mis-steps on the part of Plaintiff, Carson incurred additional expenses for equipment rentals, labor and general contractor back charges and Mr. Semango, III became understandably frustrated, threatened to deduct monies from Plaintiff's invoices and demanded to speak with Mr. Bergren.  When Mr. Bergren finally called and spoke with

25

Mr. Samango, each appears to have vented their frustration out on the other: in response to Mr. Samango's complaints regarding the mis-fabricated, late and missing product, Mr. Bergren demanded immediate payment of the overdue invoices.  When Mr. Samango informed Mr. Bergren that he would get his money when Mr. Samango got his steel, Mr. Bergren made the decision to terminate the parties' relationship.

Although this unfortunate turn of events is regrettable, given the history and the prior course of dealings between these parties, we cannot find that the late deliveries of finally correct product by Plaintiff was not within a "reasonable" time nor can we find that the Defendants' payments of Plaintiff's invoices were late.  Indeed, we find that the parties' through their course of dealings had established a pattern which neither breached and that by that course of dealing, each of these parties had waived any breach by the other.

In so finding, however, while Plaintiff may have waived the requirement that Defendants pay its invoices within thirty days, it did not waive its right to receive payment at all.  Nor did Defendants waive their rights to recover any damages which they may have incurred as a result of Plaintiff's failure to supply conforming goods.  Indeed, under §2-309, 810 ILCS 5/2-309(2) and (3), "[w]here the contract provides for successive performances but is indefinite in duration, it is valid for a reasonable time

but unless otherwise agreed may be terminated at any time by either party," provided "that reasonable notification be received by the other party...".  Section 2-714, 810 ILCS 5/2-714(1) and (3), in turn provides that "[w]here the buyer has accepted goods and given notification" [of non-conformity under subsection (3) of Section 2-607)], "he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable," and also "[i]n a proper case any incidental and consequential damages...".

Here, Plaintiff gave Defendants several weeks' notice of its intent to terminate and shipped to Defendants all of the work which was in progress.  Hence, we do not find a breach on Plaintiff's part as to the termination of the contract.  In stopping payment on the April 19, 2013 check and in failing to pay any of the other outstanding invoices for the February - April 30, 2013 time period, however, Defendants are clearly in breach of their payment obligations.  Plaintiff is entitled to judgment in its favor for the full amounts still due and owing on its outstanding invoices.[9]

---

[9]  Having resolved the issues presented under the breach of contract theory, we do not address Plaintiff's claim for unjust enrichment.  Illinois law provides that "[w]hen two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract."  Utility Audit, Inc. v. Horace Mann Serv. Corp., 383 F.3d 683, 688-89 (7th Cir. 2004)(citing Cromeens, Holloman, Sibert, Inc. v. AB Volvo, 349 F.3d 376, 397 (7th Cir. 2003) and General Agents Ins. Co. Of America, Inc. v. Midwest Sporting Goods Corp., 349 Ill. App. 3d 529, 285 Ill. Dec. 800, 812 N.E. 2d 620, 626 (Ill. App. Ct. 2004)).

But, it is equally clear that Defendants repeatedly notified Plaintiff of the non-conforming nature of the rebar and of its pressing needs for properly fabricated product delivered in a timely fashion.  As a result of not receiving that which it had ordered when it needed it, Defendants likewise suffered damages to the extent of a $40,000 general contractor backcharge, $11,000 in excess deck forms and grade beam form rentals and $48,800 in excess labor costs occasioned by the delays.[10]  Defendants are entitled to judgment in their favor on the counterclaim for the amount of these losses.  Accordingly, we now enter the following:

### Conclusions of Law

1.  This Court has jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C. §1332.

2.  By virtue of the execution of the written Application for Open Line of Credit presented by Metal Partners Rebar to Anthony Semango, Jr., President of Carson Concrete Corporation on or about November 14, 2011, and the series of discussions between Michael Actman and Anthony Semango, III as memorialized in the electronic mail communications in October and November, 2011, November, 2012 and February, 2013 a contract existed between

---

[10]  See, Defendants' Exhibit "P," and N.T. 1/26/15,,128-131).  We find that these are the only damages to which Defendants are entitled after weighing the testimony of Mr. Semango, III and in consideration of the emails between he and Mr. Actman reflecting the price differentials for detailing on product supplied by MPR and that which may be supplied by others.  Indeed, there does not appear to have been a meeting of the minds as to the status of MPR as Defendants' exclusive provider of rebar for these projects.

Plaintiff and Defendants.

3.   Under the terms of that contract, Plaintiff agreed to provide detailing services through Vector Shades of McLean, Virginia and to provide fabricated rebar pursuant to purchase orders received from Carson Concrete for delivery at a reasonable time to Carson's job sites at the Bucks County Justice Center in Doylestown, PA, 3737 Market Street, 1910 Spring Garden Street and 30th and Chestnut Streets in Philadelphia, PA.

4.   Although Plaintiff's credit application and invoices dictated that payment was to be made within thirty days of issuance, these payment terms were modified by the parties' course of dealings which permitted Defendants to make payments as much as 71 days from the date of invoice.

5.   Although he signed the Credit Application as President and on behalf of Carson Concrete, by signing, Anthony Semango, Jr. agreed to be personally, jointly and severally responsible for the payment of all sums due and unconditionally and irrevocably guaranteed payment of those invoices issued by MPR to Carson.

6.   By virtue of its failure to deliver the properly fabricated rebar ordered by Defendants within the time frames established by the parties' course of dealings, Plaintiff caused Defendants to suffer certain damages in the form of a general contractor backcharge, and excess labor and form and equipment

29

rental costs.  These damages total $99,800.00.

7.  By virtue of its decision to stop payment on check no. 410 in the amount of $31,033.66 which was issued on April 19, 2013 in payment of the Plaintiff's invoices for February, 2013 and in failing to pay any of Plaintiff's invoices for product delivered in March and April, 2013, Defendants Carson Concrete Corporation and Anthony Samango, Jr. owe Plaintiff the sum of $246,988.38 jointly and severally, together with an administrative collection fee of $50.00 as well as the reasonable court costs and attorneys' fees which Plaintiff has incurred in having to institute this litigation.

An Order of Judgment follows.